# DONALDSON *v.* WRIGHT.

PLEADING AND PRACTICE ; DEMURRER ; INJUNCTION TO RESTRAIN
OFFICIAL ACTS.

1. A demurrer only admits the truth of facts well pleaded, and not
matters of inference, however clearly stated ; nor does a de-
murrer to a bill in equity admit matters of law or that the con-
struction of a statute or instrument set forth or referred to
in the bill is the correct construction, or that such statute im-
poses or confers a right which the bill alleges.

2. A court of equity cannot interpose by injunction at the instance of
a special Census agent employed to compile and prepare a bulle-
tin upon a special subject, to arrest and restrain the work of
printing, publishing and distributing such bulletin by the
Superintendent of the Census, because it is not in all respects in
form and substance the bulletin prepared by complainant, and
its publication may affect and injure him in his character as an
author and statistician.

3. And the fact that such a bulletin originally prepared was accepted
by the Superintendent of the Census and approved by the Sec-
retary of the Interior under whose supervision the work of the
census was done, would not bind the Census office to publish it
in its original form, but would leave it subject to revision, cor-
rection and alteration by the Superintendent, under the direction
of the Secretary, until it was actually published.

4. This court will not remand a cause for the granting of an injunc-
tion to restrain a public official act that has been done and
accomplished during the pendency of the cause ; nor award an
injunction against a public official whose term of office has ex-
pired since the filing of the bill ; *following* Backus Steam
Heater Co. *v.* Simonds, 2 App. D. C. 290.

No. 412.  Submitted April 16, 1895.  Decided September 30, 1895.

HEARING on an appeal by the complainant from a decree
sustaining a demurrer to and dismissing a bill for an in-
junction.  *Affirmed.*

The COURT in its opinion stated the case as follows :

The bill in this case was filed on the 11th of December,
1894, by the appellant, Thomas Donaldson, against the ap-

pellee, Carroll D. Wright, in his official character as the Commissioner of Labor, assigned to and performing the duties of Superintendent of Census, by virtue of the act of Congress of October 3, 1893, authorizing the President of the United States to make such assignment to perform the duties of Superintendent of Census under the direction of the Secretary of the Interior, until the work of closing the Eleventh Census was completed.

The object of the bill is to obtain an injunction to restrain the defendant Wright, acting Superintendent of Census under such appointment or assignment, from printing, issuing or publishing any altered, changed or emasculated report purporting to be a bulletin or report of the kind and character described in the bill, and particularly bulletin entitled " Extra Census Bulletin ; the five civilized tribes, Indian Territory," and particularly from using therein the name of the plaintiff, and from referring to him in any way therein in such way as to make him appear to be the author, compiler, or preparer of such bulletin or report, or any part thereof. The bill was demurred to, and the case was heard and decided by the court below upon such demurrer. The general question is, whether the bill, by the facts alleged therein, shows such case as will entitle the plaintiff to the relief prayed for.

The case being presented on demurrer, it is proper that the material facts alleged be somewhat fully stated, before proceeding to consider the questions arising thereon.

It is alleged in the bill that the plaintiff had been extensively engaged in the investigation of the Indian affairs, and their relation to the Government ; and that he had prepared and published, with the approval of Government officials, several works in relation to the affairs and condition of the Indians within the jurisdiction of the United States.

It is also alleged, that the plaintiff, in February, 1890, was appointed by Robert P. Porter, then Superintendent of the Eleventh Census, " as special agent of the Census,"

with the designation of "expert special agent," the said appointment being made under and by virtue of the provision of the act of March 1, 1889, entitled "An act to provide for taking the Eleventh and subsequent Censuses." That the plaintiff, in the exercise of his duty, originated and devised the plan and method of making an enumeration of all Indians living within the jurisdiction of the United States, except Alaska, with such information as to their condition as was obtainable, classifying them as Indians taxed and Indians not taxed, which received the approval of the Superintendent of the Census and of the Secretary of the Interior; and thereafter, according to said plan and method, he supervised, edited, compiled, and, in part, wrote, *extra* census bulletins, showing the state and condition of the several Indian tribes or communities within the United States; all of which "extra census bulletins' were approved by the then Superintendent of the Census, and were printed and distributed under his direction. That the plaintiff, in discharge of his duty, pursuant to the plan and method devised and approved as aforesaid, superintended, edited, compiled, in part wrote, and is the author of the *extra* bulletin entitled " Indians, the five civilized tribes, of Indian Territory, Cherokee Nation, Creek Nation, Seminole Nation, Choctaw Nation, and Chickasaw Nation: by Thomas Donaldson, expert special agent," profusely illustrated, and containing valuable maps, and a descriptive list of contents is inserted in the bill.

It is also alleged, that the plaintiff submitted the copy of such *extra* census bulletin to Superintendent Porter, who thereupon issued an order of approval in the following terms :

"WASHINGTON, June 6th, 1893.

" MY DEAR MR. DONALDSON : I herewith hand you copy of memorandum of changes and modifications for *extra* census bulletin on five civilized tribes. Some of Mr. Blodgett's suggestions I regard as essential; others I am, as you see, willing to waive. With these changes the bulletin is hereby approved and may go to the printer ;"

—which letter was signed by the Superintendent. And on the same day that this qualified approval was addressed to the plaintiff, the Superintendent addressed a letter of transmission of the bulletin to the Secretary of the Interior in the following terms :

"Department of the Interior, Census Office,
Washington, D. C., June 6, 1893.

"Sir : This bulletin of the history and present condition of the five civilized tribes in Indian Territory is the result of patient investigation, and much research. It was prepared under the direction of Mr. Thomas Donaldson, expert special agent, and is largely the result of his personal investigation. The four special agents who served in this work in Indian Territory, viz.: Fletcher Meredith, with the Cherokees ; William H. Ward, with the Creeks and Seminoles ; J. W. Lane, with the Choctaws, and John Donaldson, with the Chickasaws, rendered efficient and faithful service. The census of the five civilized tribes was taken under great difficulties. It is believed that the information and *data* contained in this bulletin will be of value in the settlement of questions yet to be adjusted between the United States and these five civilized tribes. This bulletin has been prepared under the authority of a clause in the act of March 1, 1889, to provide for taking the Eleventh and subsequent Censuses, viz : "The Superintendent of Census may employ special agents or other means to make an enumeration of all Indians living within the jurisdiction of the United States, with such information as to their condition as may be obtainable, classifying them as to Indians taxed and Indians not taxed."

"Very respectfully,

"Robert P. Porter,

"Sup. of Census.

" The Secretary of the Interior."

It is not alleged that the bulletin was approved by the Secretary of the Interior and by him ordered to be printed and published ; but it is alleged that, after the transmission

thereof to the Secretary, to wit, on the 5th of July, 1893, the Superintendent of Census furnished a copy of the bulletin to a member of the Senate Committee on Indian Affairs, and that such copy was afterwards printed among the Senate proceedings at the Government Printing Office, after the same had been revised and corrected by the plaintiff. It is further alleged, that, by reason of the premises stated, the said *extra* census bulletin or report became, and is the official *extra* census bulletin or report of the Eleventh Census of the five civilized tribes of the Indian Territory, and said bulletin or report thereby became and is a part of the public records and archives of the United States, and that no officer thereof had the lawful right or power to interfere with, alter, change, add to, or subtract from the same, except for the correction of manifest errors and the making of proper insertions therein, &c.

It is further alleged, that the defendant, after he began the performance of the duties of Superintendent of Census, caused to be altered, changed, added to, subtracted from, and otherwise mutilated and emasculated the said *extra* census bulletin or report of and concerning the five civilized tribes of Indians, by eliminating therefrom maps, illustrations, text, index, statements of law and of fact, and other essential and material matter and *data*, to such an extent as to make it impracticable to set the same forth at length in the bill, but the same would be made to appear at the hearing ; and the plaintiff then proceeds to state some of the eliminations from and alterations in the bulletin, both of law and fact.

He also alleges, that such *extra* census bulletin, so altered and changed by the defendant, is calculated to and will deceive the public in the particulars mentioned and others to be pointed out at the hearing, and that it is particularly damaging and injurious to the plaintiff, and to his reputation and standing as one well informed in the history, life, condition and characteristics of the Indians, and of the laws relating to them ; that such altered and changed cen-

sus bulletin is prejudicial and damaging to the plaintiff in several respects, to wit: That the original bulletin as prepared by the plaintiff and under his direction, bore evidence of the fact that it was his work, and had his name in the title page thereof, with the approval of Superintendent Porter; but, in the altered and changed bulletin made by the defendant, it is falsely stated in his letter of transmission to the Secretary of the Interior, dated August 25, 1894, that said bulletin "was originally prepared by the special agent in charge, but his report has been revised and rearranged by the editors of the census under my direction, which revision and rearrangement, however, are not approved by him. The revision and rearrangement have not in any way changed facts reported by him, obtained from original sources, but relate mostly to construction and the elimination of matter obtainable from other official reports;" whereas in truth and in fact, "the special agent in charge" thus referred to is the plaintiff, and the revision and rearrangement, so made by the defendant, have changed the facts obtained from original sources and reported by the plaintiff, and such changes do not relate mostly to construction and the elimination of matter obtainable from other official sources, as stated in such letter of the defendant. The plaintiff further alleges, that in April, 1894, and from thence on to August following, he wrote letters to the defendant in which he expressly forbade the defendant to alter, change, or emasculate his said *extra* census bulletin or report, and directed him to omit his name, so that it should not appear directly or inferentially, in any altered, changed or emasculated bulletin or report that the defendant might make or issue; but the defendant refused to comply with such request, and asserted that he had the right to use the name of the plaintiff in such bulletin as he might cause to be made, and he thereafter wrote the letter of transmittal of said bulletin to the Secretary of the Interior as before stated; though it was well known to the public that the plaintiff was the author and compiler of the original and

correct *extra* census bulletin ; and that on page 44 of such changed and altered bulletin, the part thereof relating to the Delaware Indians, Cherokee Nation, it is stated that the work is " by Thomas Donaldson, special agent," which part of said bulletin was also altered and changed by the defendant, all of which things were done by the defendant wrongfully and without lawful right, and to the prejudice and irreparable damage of the plaintiff, and which will deceive and mislead the public ; and that, unless restrained by the court, said changed and altered bulletin will be distributed to the public institutions of the country, thereby disseminating false and inaccurate statements of fact and of law, and thus withhold from the public much valuable information of fact and law clearly and truthfully set forth in the genuine bulletin or report prepared by the plaintiff, and will thereby bring into contempt and disrepute the plaintiff as a citizen and an author conversant with the subject-matter, and for which injury he has no adequate remedy at law ; wherefore, &c.

It does not appear that a copy of either the original bulletin as prepared by the plaintiff, or that altered and changed under the direction of the defendant, was filed as an exhibit with the bill ; though both were proffered to be produced at the hearing of the cause. A printed copy of the bulletin as directed and authorized by the defendant, and which has been printed at the United States Census printing office, 1894, under the authority of the head of the Department of the Interior, was produced by counsel for the defendant at the argument, and the authenticity of which not being denied by counsel for the plaintiff, such document may therefore be taken to be the bulletin complained of by the plaintiff.

Upon demurrer to the bill, the court below, after careful consideration of the case as presented by the allegations contained in the bill, determined that there was no ground shown for an injunction, and therefore passed an order dismissing the bill, and from which order this appeal has been taken.

*Mr. W. W. Dudley*, *Mr. L. T. Michener* and *Mr. John C. Chaney* for the appellant.

*Mr. John I. Hall*, Assistant Attorney-General of the United States, and *Mr. Vivian Brent* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

Before examining the several questions discussed at bar, it is proper that we should refer to the several provisions of the statutes, declaring the duties of the officers and employees of the Census Bureau, and the extent and nature of the supervisory power of the Secretary of the Interior over the work of that bureau.

By section second of the act of Congress of March 1, 1889, ch. 319, entitled "An act to provide for taking the Eleventh and subsequent Censuses," it is provided "That there shall be established in the Department of the Interior an office to be denominated the Census Office, the chief officer of which shall be called the Superintendent of Census, whose duty it shall be, *under the direction of the head of the Department*, to superintend and direct the taking of the Eleventh Census of the United States, in accordance with the laws relating thereto, and to perform such other duties as may be required of him by law."

By section five, it is provided that "Whenever it shall appear that *any portion of the enumeration and census provided for in this act* has been negligently and improperly taken, and is by reason thereof incomplete, the Superintendent of the Census, *with the approval* of the Secretary of the Interior, may cause such incomplete and unsatisfactory enumeration and census to be amended, or made anew, under such methods as may, *in his discretion*, be practicable." And by section nine, it is provided that the Superintendent of Census may employ special agents, or other means to make an enumeration of all Indians living within

the jurisdiction of the United States, with such information as to their condition as may be obtainable, classifying them as to Indians taxed, and Indians not taxed. The statute provides for the compensation of all persons employed for the performance of services thereunder ; and in this case there is no question of the fact that the plaintiff was duly employed as special agent under the act, and has been fully paid for all services rendered by him.

By the subsequent act of October 3, 1893, to which reference has already been made, it was provided that the President might, in his discretion, authorize and direct the Commissioner of Labor to perform the duties of Superintendent of the Census, *under the direction* of the Secretary of the Interior, until the work of closing the Eleventh Census was completed. It was under this provision of the statute that the defendant was assigned to the duty of the position of Superintendent of the Census in the place of Robert P. Porter, who resigned July 31, 1893. The act of Congress of February 23, 1893, provides for the publication and distribution of the reports, special reports and monographs, of the Eleventh Census, including those relating to Indians.

The taking of the National Census is a work of great political importance, and the correctness of the work, in its several branches, is not vouched for as the work simply of individual subordinates, whether employed as expert special agents or otherwise, but as the work done by many, revised, corrected and formulated under the supervision, direction and control of the head of the appropriate executive department of the Government. Hence all the work done, and required to be done, under the acts relating to taking the census, is required to be under the direction and with the approval of the Secretary of the Interior. And these terms are not without force and meaning, as applied to the head of the department ; for as was said by the Supreme Court of the United States, in speaking in reference to the control of the General Land Office, " the phrase

*under the direction* of the Secretary of the Interior, as used in the statute, is not meaningless, but was intended as an expression in general terms of the power of the Secretary to supervise and control the extensive operations of the Land Department, of which he is head." *Knight* v. *United Land Asso.*, 142 U. S. 161, 177. And so in respect to the work and affairs of the Census Office, of which he is head. The work was required to be done under his supervision and direction, and subject to his approval. And therefore it is only the work that has received his approval that can be published as the work of the Census Office.

The demurrer only admits the truth of facts well pleaded, and not matters of inference and argument, however clearly stated ; nor does the demurrer admit matters of law or that the construction of a statute or other instrument set forth or referred to in the bill is the correct construction, or that the statute imposes the duty or confers the right which the bill alleges. These are matters of law for determination by the court. *Dillon* v. *Barnard*, 21 Wall. 430, 437 ; *Pennie* v. *Reis*, 132 U. S. 464. It cannot, therefore, be controlled by mere averment.

Now, treating the case stated in the bill in the most favorable aspect for the plaintiff—putting aside the fact of the official subordination of the plaintiff to superior officers of the department, and the condition necessarily implied in the employment, of the right and power of change in and revision of the work done by the plaintiff—do the facts alleged present a case for relief, according to the settled principles of a court of equity ? As we have seen, the bulletin, as originally prepared by the plaintiff, was not made up of original matter, but was largely a mere compilation of materials derived from various sources : or, in the language of the averment of the bill, the plaintiff, pursuant to a plan and method devised and approved, superintended, edited, compiled, and in part wrote, the bulletin, and, as he claims, is the author thereof. There is, how-

ever, no pretense of any copyright, or any right analogous to that of copyright, vested in the plaintiff. And having been employed and paid for his work, he has no right of property of any kind in the bulletin, either by statute or the common law, and certainly none by contract. Indeed, it is conceded by the plaintiff that he has no proprietary or property right in the bulletin ; and, accordingly, in the brief filed on his behalf, it is distinctly declared that he makes no claim to any such right. In the brief it is said : " It was never claimed by the appellant that he had such a property interest in his compilation as would entitle him to a copyright thereon, or that he had a right to control the compilation after it left his hands. But what he does allege and claim is, that his compilation having been approved by the then Superintendent of Census, and the then Secretary of Interior, the public are entitled to it as he compiled it, and that in no event may the appellee emasculate, alter and pervert the facts collected in his said compilation, and then publish it with all its unreliable and untruthful amendments *as appellant's compilation.* For to do so, appellant alleges, will bring him into disrepute as an author and compiler, and that thereby appellant's good name, fame and reputation will suffer irreparable damage and irremediable mischief."

If this contention, thus deliberately stated, cannot be maintained, either upon reason or authority, it would seem to be clear that the case stated in the bill is subject to the demurrer, and must therefore fail because it is not within equitable cognizance.

In 2 Sto. Eq. Juris., sec. 948*a*, the principle applicable to a case of this character is clearly stated. That learned author and jurist, after discussing the general doctrine in the preceding sections of his work, says : " But the utmost extent to which courts of equity have gone, in restraining any publication by injunction, has been upon the principle of protecting the rights of property in the book or letters sought to be published. They have never assumed, at

least, since the destruction of the Court of Star Chamber, to restrain any publication, which purports to be a literary work, upon the mere ground, that it is of a libellous character, and tends to the degradation or injury of the reputation or business of the plaintiff, who seeks relief against such publication. For, matters of this sort do not properly fall within the jurisdiction of courts of equity to redress, but are cognizable, in a civil or criminal suit, at law. To justify, therefore, the interposition of a court of equity, by way of injunction, in cases of literary publication, there must be an invasion by the defendant, of the rights of property of the plaintiff, or some direct breach of confidence connected therewith."

And so in Kerr on Injunctions, page 186, it is laid down as established doctrine, that a man who agrees for a compensation to write a manuscript in such form for another as that it may enable the latter to publish it as his own composition, has no just ground of complaint in court of equity if the latter mutilates the manuscript. In the absence of a contract, express or implied, reserving to the author a qualified copyright, the owner of an unpublished manuscript may alter it as he thinks proper. And the allegation that the reputation of the author may suffer in consequence of the mutilation of the manuscript is not a ground for the interference of a court of equity; and the author cites in support of this doctrine the cases of *Clarke* v. *Freeman*, 11 Beav. 112, and *Cox* v. *Cox*, 11 Hare, 118. In the last named case the plaintiff had contracted to correct and complete, from materials to be furnished by the defendant, a book which the defendant expressed his intention to write, and agreed also to supply the legal information connected with the subject, for which the plaintiff was to be paid a certain remuneration according to the number of pages the work might contain. Upon this state of case the court refused an injunction to restrain the defendant from printing, publishing, or selling the legal part of the work, which the plaintiff had contributed, with any material alteration or

omission which the defendant had made.   The court also refused an injunction to restrain the defendant from printing, publishing or selling the work until he had paid the plaintiff the sum agreed upon for his assistance and contribution to the work.

In the opinion delivered in that case by Vice-Chancellor Wood, afterwards Lord Chancellor Hatherly, it was said: " Something was said with regard to the possible effect of the alteration of the plaintiff's portion of the work, as affecting his reputation; but, as it was held in *Sir James Clarke's Case*, 11 Beav. 112, the possible effect on reputation, unless connected with property, is not a ground for coming to this court, though it may be an ingredient for the court to consider when the question of a right of property also arises." And further on, in the course of the opinion, it was said: " A serious question was adverted to—but it is one which does not arise in this case—how far a party who had purchased a manuscript has a right to alter it, and produce it in a mutilated form?—how far, in a case in which the property has completely passed, it is to be assimilated to a case of goods sold and delivered, and thenceforward in the complete dominion of the purchaser?  A qualified contract may be made, an essay may be supplied to a magazine or an encyclopedia, on the understanding that it is to be published entire; and it may be accepted by the editor, and paid for as what it purports to be.  In the instance of an essay which has been accepted in that shape, the question might arise whether any curtailment could be allowed under that special contract.  But here there is no such special contract.  The contract is that the plaintiff shall supply the defendant with the matter which is required, in such form as to enable the defendant to publish it as his own.  I can find no circumstances from which any such special contract as I have mentioned can be inferred."

There is nothing in this case, clearly, that can give rise to any such special contract as that referred to in the case of *Cox* v. *Cox*.   But, on the contrary, all the circum-

stances—the nature of the work, and the well-understood power of supervision and control under which it was performed—necessarily implied just the reverse of such contract. The power of revision, alteration and omission by the superior, was necessarily implied in the nature of the work performed by the subordinate, and the latter had no such vested right in the report made by him, as to entitle him to have the power of revision, alteration, and omission restrained by injunction.

But if it be conceded, as it well may be, in fairness and justice to the plaintiff (it being deemed necessary or proper to materially change and modify the bulletin as originally prepared by him), that his name ought to have been entirely omitted from the work, according to his request, but which was not done; and that, as between individuals in such case a court of equity would interfere; yet, the question here is, can a court of equity interpose by injunction to arrest and restrain the work of printing, publishing and distribution of the bulletin by one of the Executive Departments of the Government, because it is not in all respects, in form and substance, the bulletin prepared by the plaintiff, and that its publication may effect and injure him in his character of author and statistician? To avoid and overcome the difficulty involved in this question, it is alleged, and urgently contended by the plaintiff, that the bulletin as prepared by him had been accepted and approved by the then Superintendent of Census, and also by the then Secretary of the Interior, and that the subsequent acting Superintendent, under the direction of the present Secretary of the Interior, had no right or power to modify or change such original bulletin, or to cause to be printed and published any different report or bulletin from that prepared by the plaintiff; that the bulletin having been so accepted and approved, the defendant, as acting Superintendent, was left no discretion in the premises, but it simply became his mere ministerial duty to have printed and distributed such bulletin, as directed by the act of February 23, 1893.

This is but a legal inference or conclusion, not admitted by the demurrer, and to the correctness of which this court cannot accede.  The acceptance or approval of the bulletin as prepared by the plaintiff may have been proper, so far as the plaintiff was concerned, but such approval did not invest the plaintiff with any interest or right in the use of the bulletin, and did not bind those in charge of the Census Office to print and publish it, and it remained subject to the power of revision, correction and alteration by the Superintendent of Census, under the direction of the Secretary of the Interior, until it was actually printed and published as authorized and directed by the act of Congress of February 23, 1893.  To hold otherwise, and according to the contention of the plaintiff, would be making a mischievous precedent, and one that might, and likely would, give rise to much trouble in the departments of the Government, where so much of the work is done by subordinates in the way of furnishing *data* and statistics for the approval and action of superiors.

The cases of *Marbury* v. *Madison, Sec'y of State*, 1 Cr. 137, and *Noble, Sec'y of Interior*, v. *The Logging Co.*, 147 U. S. 165, have been much relied on in support of the contention of the plaintiff, and as showing that the power of review, revision, and alteration had terminated, and that there was nothing remaining for the acting Superintendent but the exercise of the mere ministerial duty of printing and publishing the bulletin as originally prepared.  But we are wholly unable to perceive wherein those cases give support to the supposed right of the plaintiff in this case.

In the case of *Marbury* v. *Madison*, Marbury had been nominated, confirmed, and appointed a justice of the peace for the District of Columbia, and his commission had been made out, signed and sealed, and nothing remained to be done except delivery of the commission, and the duty of delivery was imposed upon the Secretary of State by law. It was held that Marbury was entitled to his commission and that the duty of delivery was *merely ministerial*, and

that such duty could be enforced by *mandamus.* In that celebrated case, some of the positions stated by the great Chief Justice who delivered the opinion, have been in subsequent cases somewhat qualified or restricted, but none that affect this case.

In the case of *Noble* v. *The Logging Co.,* the question was presented in a twofold aspect, 1st, whether the courts could enjoin the head of a department of the Government; and 2d, whether the power of a Secretary of the Interior to annul the action of his predecessor, *when such action operated to give effect to a legislative grant of public lands* to a railroad corporation, could be reviewed by the judicial department of the Government. In that case the court clearly noted the distinction between acts involving the exercise of judgment and discretion, and the case where purely ministerial acts are involved; and held that, with respect to the former there exists, and can exist, no power to control the executive discretion, however erroneous its exercise may seem to have been: but with respect to ministerial duties, an act or refusal to act is, or may become, the subject of review by the courts. Therefore, where the act of the head of a department, under any view that could be taken of the facts that were laid before him, was *ultra vires,* and beyond the scope of his authority, he would be subject to the jurisdiction of the courts. If he has no power at all to do the act complained of, he is as much subject to an injunction in such case as he would be to a *mandamus* if he refused to do an act which the law plainly required him to do. "In that case," said the court, "upon the Secretary becoming satisfied of the existence of the prerequisite required by the statute, and that all the other requirements of the act had been observed, he was authorized to approve the profile of the road, and to cause such approval to be noted upon the plats in the land office for the district where such land was located. When this was done, *the granting section of the act became operative,* and vested in the railroad company a right of way through the public lands to the

extent of 100 feet on each side of the central line of the road"—citing the previous case of *Frasher* v. *O'Connor*, 115 U. S. 102. In other words, by the approval of the profile of the road, and noting the same upon the plats in the land office, the right of way became vested in the railroad company—became a *vested right*—and therefore the successor in office of the Secretary of the Interior had no power to vacate the approval of his predecessor, and thereby divest the right. That would seem to be an exceedingly plain proposition, and one about which there could hardly be a serious question.

But in the case of *Gaines* v. *Thompson*, 7 Wall. 347, where there was no completed vested right, the act of the Secretary of the Interior and the Commissioner of the Land Office, in cancelling an entry for land, was held not to be a *ministerial duty*, but was a matter resting in the *judgment and discretion* of those officers as representing the Executive Department; and therefore the court would not interfere by injunction more than by *mandamus* to control it.

It that case Mr. Justice MILLER, in delivering the opinion of the court, after referring to the previous cases, among them, that of *Marbury* v. *Madison*, said: "It may, however, be suggested, that the relief sought in all those cases was through the writ of *mandamus*, and that the decisions are based upon the special principles applicable to the use of that writ. This is only true so far as these principles assert the general doctrine, that an officer to whom public duties are confided by law, is not subject to the control of the courts in the exercise of the judgment and discretion which the law reposes in him as a part of his official functions. Certain powers and duties are confided to those officers, and to them alone, and however the courts may, in ascertaining the rights of parties in suits properly before them, pass upon the legality of their acts, after the matter has once passed beyond their control, there exists no power in the courts, by any of its processes, to act upon the officer so as to interfere with the exercise of

that judgment while the matter is properly before him for action. The reason for this is, that the law reposes this discretion in him for that occasion, and not in the courts. The doctrine, therefore, is applicable to the writ of injunction as it is to the writ of *mandamus.*"

In this case the subject matter of controversy was especially within the judgment and discretion of the Superintendent of Census under the direction of the Secretary of the Interior ; it being for that officer exclusively, subject to the direction of his superior, to determine, at any time before printing and publishing the bulletin, what information as to the state and condition of the Indians, should be incorporated in the bulletin and published at public expense. It is certainly not within the province or power of the court to determine what should be inserted in or omitted from such bulletin. It is clear, therefore, that upon no principle can the relief prayed for be granted.

The question whether the Secretary of the Interior should have been made a party defendant has not been considered. The omission to make him a party has not been urged as an objection in the bill.

Since the decision of the court below, and after the case was brought into this court on appeal, the act of Congress of March 2, 1895, was passed, by which the office of the Eleventh Census has been abolished—the act providing that the unfinished work of the Census Office shall be completed in the office of the Secretary of the Interior, to whom the records and other property of the Census Office are transferred ; and the Secretary of the Interior is authorized to employ from the 4th of March, 1895, from the force of the Census Office then employed, a chief of division, and such other subordinates as might be necessary to close up and complete the work. It is also made to appear to this court, by the affidavit of the defendant, that before the filing of the bill, the bulletin complained of had been printed and partly distributed, and that, since the decision appealed from, the remaining numbers of the bulletin, with but small

exception, have been distributed as directed by the statute ; and that the defendant's duties as Superintendent of Census under the act of October 3, 1893, ceased by force of the act of March 2, 1895, from the 4th of March last, and that he has since been engaged in transferring the unfinished work of the Census Office to the Secretary of the Interior, and acting under his authority, and that all matters pertaining to the affairs of the Census Office are beyond his jurisdiction and control, and are immediately under that of the Secretary of the Interior.

In this state of affaiars, even if our conclusions in regard to the rights and remedies of the plaintiff were different from what we have stated them to be, this case would be practically ended, for we could not remand the cause for the granting of an injunction to restrain a public official act that has already been done and accomplished, nor to award an injunction against an official whose term of office has expired. *Backus Steam Heater Co.* v. *Simonds and others*, 2 App. D. C. 290 ; *United States ex rel. Inter. Contracting Co.* v. *Elkins*, 38 Bk. L. Ed. Sup. Ct. Rep. 1080.

The decree below, sustaining the demurrer and dismissing the bill, must, in any view of the case be affirmed ; and it is so ordered.

*Decree affirmed, with costs to appellee.*